1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

TROY NORVELL,

              Plaintiff,

    v.

THE COUNTY OF SANTA CLARA, et al.,

              Defendants.

Case No.  16-cv-07293-BLF

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

[Re:  ECF 59]

      Plaintiff, Mr. Troy Norvell, brought this suit against the County of Santa Clara (the "County"), the County's Sheriff's Department (the "Department"), and three unidentified county sheriff deputies (together with the County and the Department, "Defendants") on December 22, 2016, alleging violations of 42 U.S.C. § 1983 and various California state laws. *See* Compl., ECF 1. This suit arises from an alleged incident of excessive force during the custodial transfer of Mr. Norvell on March 1, 2016 and claims for denial of medical care and racial harassment. *See id.* The County filed a motion for summary judgment ("Motion") on August 6, 2020. *See* Mot., ECF 59. Mr. Norvell has not responded to the Motion. For the reasons below, the Court GRANTS Defendants' Motion.

### I.    BACKGROUND

#### a.  Procedural History

      Mr. Norvell filed his complaint against Defendants on December 22, 2016. *See* Comp. Defendants answered the complaint on January 24, 2017. *See* Answer, ECF 16. On August 16,

2019, Defendants filed a discovery letter brief indicating Plaintiff failed to appear at a properly noticed deposition. *See* Disc. Letter Br., ECF 29. On August 21, 2019, Mr. Norvell's attorney filed a motion to withdraw from the case due to irreconcilable differences and the inability to locate Mr. Norvell. *See* Mot. to be Relieved, ECF 31; Letter, ECF 33. Judge Cousins granted Defendants' Motion to Compel Deposition of Mr. Norvell on August 26, 2019, *see* ECF 34, and this Court granted Mr. Norvell's attorney's motion to be relieved on October 16, 2019. *See* ECF 36. When Defendants were unable to locate Mr. Norvell for the deposition a second time, Judge Cousins issued an order warning Mr. Norvell of the consequences stemming from his failure to participate in discovery. *See* Order Warning Troy Norvell, ECF 38. On November 13, 2019, after a non-appearance at a discovery hearing that required Mr. Norvell's appearance and affidavits indicating non-service to Mr. Norvell, Judge Cousins continued the discovery hearing until December 18, 2019. *See* Order Continuing Disc., ECF 42. The continuation was affirmed by this Court on November 25, 2019. *See* Order Den. Mot. for Relief, ECF 44. Mr. Norvell attended the December 18, 2019 hearing. *See* Min. Entry (Dec. 18, 2019), ECF 47. At a proceeding held before Judge Cousins on January 8, 2020, Judge Cousins ordered Mr. Norvell to be deposed by January 31, 2020. *See* Min. Entry (Jan. 8, 2020), ECF 52; Order After Disc. Status Hr'g, ECF 53. Mr. Norvell's deposition took place on January 23, 2020. *See* Administrative Mot. 2, ECF 54. Defendants filed their Motion for summary judgment on August 6, 2020. *See* Mot. Mr. Norvell did not file a response. Pursuant to Civil Local Rule 7-1(b), the Court determined this motion was suitable for decision without oral argument. *See* Order Vacating Hr'g, ECF 61. The hearing on Defendants' Motion for summary judgment was vacated on August 27, 2020. *See id.*

### b. Plaintiff's Complaint

Mr. Norvell is an African-American male who was physically disabled at the time of the incident in question. Compl. ¶ 22. On March 1, 2016, Santa Clara County deputy sheriffs transported Mr. Norvell—who was in the custody of the Santa Clara County Sheriff's

Department—to and from the Santa Clara County Superior Court to make a court appearance set for that date. *Id.* ¶ 10. During the transportation, Mr. Norvell was shackled with another inmate, "Freddie." *Id.* ¶ 11. Freddie was allegedly walking slowly due to a foot injury. *Id.* When a deputy sheriff and Freddie got into an altercation, Mr. Norvell was unable to remove himself from the scene because he was shackled to Freddie. *Id.* According to Mr. Norvell, another deputy sheriff then grabbed him and slammed him into a pillar extending from the wall, harming and injuring Mr. Norvell. *Id.* ¶ 12. Mr. Norvell believes this altercation was recorded on hallway monitor recording devices. *Id.* ¶ 16.

After this altercation on March 1, 2016, Mr. Norvell was placed in a cell and asked—verbally and in writing—for medical assistance for his injuries resulting from the altercation with the deputy sheriff, but his requests were denied. *Id.* ¶ 14. About one week after March 1, 2016, Mr. Norvell alleges he lost consciousness and fell, hit his head, and was further injured. *Id.* He allegedly remained unconscious in his cell for 45 minutes and did not regain consciousness until he was in the hospital. *Id.* As a result of the altercation and subsequent fall and lack of immediate medical assistance, Mr. Norvell alleges that he has suffered long term pain, fear, emotional distress, and discomfort, including "a subdural hematoma," "brain damage," and the "exacerbation of spinal damage." *Id.* ¶¶ 15, 20.

Mr. Norvell also believes that sheriff deputies "exchanged threatening, offensive, and insulting electronic communications and video recordings on their electronic devices, making threats and comments against [him], based on racial animus." *Id.* ¶ 17.

### c.  Defendants' Evidence

Mr. Norvell was arrested on January 17, 2016 for failure to re-register in a sex offender database. Mot. 3; *see also* Ex. C, Dep. of Troy Norvell 9:9–25 ("Norvell Dep."), ECF 59-6. Mr. Norvell pled no contest to the charge with advice of counsel on February 26, 2016, and was convicted and sentenced to six months in the County jail. Mot. 3; *see also* Norvell Dep. 10:1-9,

13:7-24.

### i. The March 1, 2016 Incident

On March 1, 2016, deputies placed Mr. Norvell on a sheriff's bus from the County Elmwood Correctional Facility to the County Main Jail Facility for a court appearance. Mot. 3; *see also* Norvell Dep. 56:10-15. Inmates arriving to the County Main Jail Facility are taken to the basement of the Main Jail, known as the Hub, where they are routed to various holding cells to await their court hearings. Mot. 3; *see also* Decl. of Captain Thomas Duran ¶¶ 2–3 ("Duran Decl."), ECF 59-5. At around 7:26 a.m., Deputy Julie Montalvo responded to a disturbance in the hallway of the Hub involving an inmate other than Mr. Norvell. Mot. 3; *see also* Duran Decl. ¶¶ 5–7; Ex. E, Hub Video, ECF 59-5. Deputy Montalvo walked toward Mr. Norvell, opened the door to the holding cell, and maneuvered him inside. Mot. 3; *see* Hub Video; Norvell Dep. 52:5-53:2, 54:11-55:1. Mr. Norvell testified that no one aside from Deputy Montalvo physically assaulted him that day. Mot. 3; Norvell Dep. 61:21-25, 62:14-63:1.

### ii. Mr. Norvell's Medical Care While in Custody

Mr. Norvell was medically screened when he was booked into jail on January 17, 2016. Mot. 4; *see* Decl. of Alexander Chyorny ¶ 4 ("Chyorny Decl."), ECF 59-1; Ex. G, Custody Medical Intake, ECF 59-1; Ex. H, CSCHS Patient Plan, ECF 59-1. After confirming his medications, Adult Custody Health Services ("ACHS"), the healthcare provider for the County jails, arranged for Mr. Norvell to receive his psychotropic medications and medications for hypertension. Mot. 4; *see* Chyorny Decl. ¶ 4; Ex. I, Custody Pharmacy Orders, ECF 59-1; Ex. J, Outpatient Provider Admission Note, ECF 59-1.

On March 1, 2016, ACHS nurses assessed Mr. Norvell three times for neck, right shoulder, and right rib pain that Mr. Norvell claimed resulted from being "slammed on the window by a female deputy." Mot. 4; *see* Chyorny Decl. ¶ 6; Ex. L, March 1 Custody Nursing Assessment, ECF 59-1. Mr. Norvel requested head and neck x-rays via a medical request form. Mot. 4; *see*

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Chyorny Decl. ¶ 6; Ex. M, White Card & Progress Notes, ECF 59-1. An ACHS physician examined and assessed Mr. Norvell on March 8, 2016 and diagnosed cervical sprain, AC dislocation, and chest wall pain. *Id.* The doctor also ordered an extra blanket as a neck support and non-narcotic pain medications. *Id.*

On March 10, 2016, the ACHS doctor ordered cervical, right rib, and bilateral shoulder x-rays for Mr. Norvell. Mot. 4; Chyorny Decl. ¶ 6; Ex. N, March 10 Progress Notes, ECF 59-1. On March 11, 2016, Mr. Norvell underwent cervical, shoulder, and rib x-rays, which did not indicate any acute findings but reported positive for chronic degenerative changes in his neck and left shoulder. Mot. 4; *see* Chyorny Decl. ¶ 7; Ex. O, X-Ray Report, ECF 59-1. On the same day, March 11, Mr. Norvell requested a neck brace, and an ACHS nurse advised him that a decision was pending the physician review of his x-rays. Mot. 4; *see* Chyorny Decl. ¶ 7; Ex. P, March 11 White Card Notes, ECF 59-1; Ex. Q, March 12 Custody Nursing Assessment, ECF 59-1. From March 13 to March 17, 2016, Mr. Norvell requested a neck brace twice more and an ACHS nurse advised him that his request was pending the physician review of his x-rays. Mot. 4; *see* Chyorny Decl. ¶ 8; Ex. R, March 13 White Card Notes, ECF 59-1; Ex. S, March 14-17 Custody Nursing Assessment, ECF 59-1.

On March 17, 2016, an ACHS physician ordered a 14-day cervical collar for Mr. Norvell and further flexion-extension cervical x-rays. Mot. 4; *see* Chyorny Decl. ¶ 9; Ex. T, March 17 Progress Notes, ECF 59-1; Ex. U, Medical Authorization Form, ECF 59-1. The next day, on March 18, 2016, Mr. Norvell underwent flexion-extension cervical imaging, which reported as negative for fracture and positive for significant degenerative changes. Mot. 5; Chyorny Decl. ¶ 9; Ex. V, XR Cervical Spine, ECF 59-1.

On March 22, 2016, another ACHS physician examined and assessed Mr. Norvell. Mot. 5; Chyorny Decl. ¶ 10; Ex. W, March 22 Progress Notes, ECF 59-1. The ACHS physician noted that Mr. Norvell's report of decreased sensation in both upper extremities did not conform to normal

5

neurological distribution. *Id.* The physician diagnosed cervical osteoarthritis and cervical sprain. *Id.* The physician also ordered a medication change and confirmed a cervical collar for six weeks, noting that the appropriate time frame to order the collar was that day, March 22. *See id.* From March 22 to March 24, 2016, Mr. Norvell submitted medical request forms complaining about the delay in provision of a neck collar and his medication change. Mot. 5; *see* Chyorny Decl. ¶ 11; Ex. X, March 22 White Card Notes, ECF 59-1; Ex. Y, March 23 Custody Nursing Assessment, ECF 59-1; Ex. Z, March 24 Custody Nursing Assessment, ECF 59-1. Twice during this time, ACHS nurses assessed Mr. Norvell and advised him that his neck collar was on order and that he would be receiving a new muscle relaxer for pain. *Id.* During one of these assessments, Mr. Norvell reported that he was going to have a "man down," or an incident involving an inmate needing immediate medical attention, to be sent to the hospital. Mot. 5; *see also* Chyorny Decl. ¶ 11; March 23 Custody Nursing Assessment.

On March 25, 2016, Mr. Norvell suffered a blackout witnessed by his cellmate, who reported that Mr. Norvell was standing in his cell and then leaned against a wall and slid to the floor without hitting his head. Mot. 5; *see also* Chyorny Decl. ¶ 12; Ex. AA, Emergency Resp. Report, ECF 59-1. The man down was called at 11:50 a.m. and help arrived at 11:55 a.m. Emergency Resp. Report. Mr. Norvell was taken by ambulance to Santa Clara Valley Medical Center ("SCVMC") at 12:50 p.m. Mot. 5; *see also* Chyorny Decl. ¶ 12; Emergency Resp. Report. At SCVMC, Mr. Norvell presented with lumbar, thoracic, and cervical pain and numbness and tingling in all extremities associated with a fall involving injury to his head and loss of consciousness. Mot. 5; *see also* Chyorny Decl. ¶ 13; Ex. BB, SCVMC Notes 615, ECF 59-1. SCVMC physicians transferred Mr. Norvell to the ICU and ordered a full diagnostic work-up to assess a potential spinal cord injury – which was eventually ruled out. Mot. 5; *see also* Chyorny Decl. ¶ 13; SCVMC Notes 616–619, 635–645, 681–685, 694–705. An MRI did indicate chronic degenerative joint disease in the spine. *See* SCVMC Notes 640–41. On March 29, 2016, Mr.

6

Norvell was transferred back to the Elmwood Correctional Facility. Mot. 5; *see also* Chyorny Decl. ¶ 13. Dr. Chyorny reviewed Mr. Norvell's SCVMC chart, modified the SCVMC discharge order to substitute tramadol for morphine and oxycodone consistent with ACHS Pain Management Protocol, and authorized use of a cervical collar for six weeks and a walker for two weeks. Mot. 5; *see also* Chyorny Decl. ¶ 13; Ex. CC, CSCHS Medication Verification, ECF 59-1; Ex. DD, Pain Management Protocol, ECF 59-1. There is no mention in Mr. Norvell's SCVMC chart of a subdural hematoma or brain damage. Mot. 6; *see* Chyorny Decl. ¶ 13; SCVMC Notes.

Mr. Norvell denied pain or discomfort during a welfare check by an ACHS nurse on March 30, 2016. Chyorny Decl. ¶ 14. On March 31, 2016, Mr. Norvell requested a change in pain medication away from tramadol, and Dr. Chyorny responded by changing his pain medication to acetaminophen and naproxen. Mot. 6; *see also* Chyorny Decl. ¶ 14; Ex. EE, March 30-31 Custody Nursing Assessment, ECF 59-1; Ex. FF, April 1 Progress Notes, ECF 59-1. Until his release on April 16, Mr. Norvell requested further pain medication, which ACHS physicians accommodated in each instance. Mot. 6; *see also* Chyorny Decl., ¶¶ 15–17; Ex. GG, April 4 Progress Notes, ECF 59-1; Ex. HH, April 11 Progress Notes, ECF 59-1; Ex. II, April 14 Custody Nursing Assessment, ECF 59-1.

### iii.  The Alleged Verbal Harassment Incident

Mr. Norvell testified about a single event of verbal harassment during his deposition. Mot. 6; *see* Norvell Dep. 96:8-102:9. He stated that on the day he was getting his x-rays completed, a group of deputies allegedly took video of him on their cell phones, and then, one of the deputies said to him, "you are lucky you aren't one of mine." *Id.* Norvell believed this event had racial connotation aimed at him because of his skin color, as all of the deputies allegedly recording him were white and Mr. Norvell is African American. *Id.*

### d.  Mr. Norvell's Government Tort Claims Against Defendants

Mr. Norvell filed and mailed a general Claim Form and a Government Tort Claim to the

County of Santa Clara Board of Supervisors on March 8–9, 2016. Compl. ¶ 7; *see also* Ex. F, Claim Forms, ECF 59-6; Norvell Dep. 20:24-22:20. On April 1, 2016, the County mailed Mr. Norvell a notice of rejection of his claim to 1425 Bay Road, East Palo Alto, CA 94303, Mr. Norvell's listed mailing address. Mot. 6; Decl. of Tam Lobach ¶¶ 1–3 ("Lobach Decl."), 59-4; Ex. B, Notice of Rejection, ECF 59-4. During his deposition, Mr. Norvell was shown a copy of the County's notice of rejection dated April 1, 2016 and he recognized it. Mot. 6–7; Norvell Dep. 25:3-19.

When Mr. Norvell was released from County custody in April 2016, he showed his attorney, Nick Emanuel, copies of the claims he mailed to the County. Mot. 7; Norvell Dep. 23:3-24:24. Around June 3, 2016, Nick Emanuel sent an email to a Deputy County Counsel to discuss the case. Mot. 7; *see* Decl. of Aryn Harris ¶ 2 ("Harris Decl."), ECF 59-2; Ex. A, Emails, ECF 59-2. In this email, Mr. Emanuel asked whether the County was interested in a pre-filing settlement of Mr. Norvell's claim involving the March 1, 2016 incident and mentioned his belief that Mr. Norvell's claim had been rejected so there was a clock ticking on filing a lawsuit. *Id.* Mr. Norvell filed his complaint on December 22, 2016. *See* Compl.

Mr. Norvell brings six claims against Defendants: (1) violation of civil rights under 42 U.S.C. § 1983; (2) violation of civil rights under California Civil Code § 52.1; (3) an act of violence motivated by racial bias under California Civil Code § 51.7; (4) assault; (5) negligence; and (6) intentional infliction of emotional distress. *See id.* ¶¶ 24–62. Under his Section 1983 claim, Mr. Norvell advances four theories: unreasonable seizure, excessive force, deliberate indifference, and verbal harassment. *Id.* ¶¶ 17, 24–30. Mr. Norval maintains that the Deputies knew they were acting unlawfully and in violation of the Fourth Amendment when they assaulted, battered, and restrained him due to their unreasonable seizure and use of excessive force during the assault and their knowing and deliberate withholding of medical treatment. *Id.* ¶¶ 19; 25–27. This, Mr. Norvell states, amounted to an extreme abuse of their positions of authority, a grossly negligent

8

performance of their duties, and/or internal misconduct. *Id.* ¶ 19. Mr. Norvell also alleges that the County and Sheriff's Department are directly liable to him for "their inadequacy of deputy training on the interaction with and custody of jail inmates," which amounts to deliberate indifference to the rights of Mr. Norvell. *Id.* ¶ 21. The failure to train includes the "failure to provide relevant training and education, to implement policies, procedures, and practices necessary to proper interaction with jail inmates, and to conduct adequate peace officer performance reviews, investigations, and corrections of previous violations." *Id.* ¶ 29. Finally, although not explicitly pled under the Section 1983 claim, Mr. Norvell alleges that some deputies violated his civil and constitutional rights by exchanging offensive communications and video recordings of him due to racial animus. *Id.* ¶ 17, 27, 29. Mr. Norvell's state law claims are based upon the same facts and theories alleged under the Section 1983 claim. *See id.* ¶¶ 31–62.

## II.   <u>LEGAL STANDARD</u>

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element

9

to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Id.* at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. However, "the 'mere existence of a scintilla of evidence in support of the plaintiff's position'" is insufficient to defeat a motion for summary judgment. *Id.* (quoting *Anderson*, 477 U.S. at 252). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*; *see, e.g.*, *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028–29 (9th Cir. 2001).

## III.   <u>DISCUSSION</u>

Defendants move for summary judgement on all of Mr. Norvell's claims. *See generally* Mot. The Court addresses the arguments raised in Defendants' Motion in turn.

### a.   Constitutional Violations Against Defendants under 42 U.S.C. § 1983

In Count One of his Complaint, Mr. Norvell asserts a claim alleging Defendants deprived him of the right to be free from unreasonable seizures and excessive force protected by the Fourth Amendment. Compl. ¶ 25. Mr. Norvell also claims that Defendants were deliberately indifferent to his medical needs and the County and Department were deliberately indifferent in properly training their deputies. *Id.* ¶¶ 26–29. Finally, Mr. Norvell asserts that some deputies verbally harassed him based on his race, resulting in civil rights violations. *Id.* ¶ 17, 27, 29. Mr. Norvell has sued the County, the Sheriff's Department, and individual Doe deputies. *See id.* Section 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). While government agencies may be sued under Section 1983 for unconstitutional policies or customs, a plaintiff must establish that an underlying constitutional harm was inflicted upon the plaintiff. *Gibson v. County of Washoe*, 290 F.3d 1175, 1193–1194 (9th Cir. 2002), *overruled on other grounds*, *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

"[I]f a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Claims for unreasonable seizures, excessive force, and deliberate indifference fall under the Eighth Amendment for convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979); *see also Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004). A pretrial detainee is transformed into a convicted prisoner for constitutional purposes upon conviction by plea. *See Resnick v. Hayes*,

213 F.3d 443, 447–448 (9th Cir. 2000). Because Mr. Norvell pled nolo contendere to the charge of failure to register as a sex offender under California law on February 26, 2016, and was convicted and sentenced to six months in jail, the Eighth Amendment will apply to Mr. Norvell's claims stemming from the March 1, 2016 incident. *See Bell*, 441 U.S. at 535–36; *Demery*, 378 F.3d at 1028–29; *see also* Mot. 3; Norvell Dep. 10:1-9, 13:7-24.

Mr. Norvell's unlawful seizure, excessive force, deliberate indifference, and verbal harassment claims are discussed below. Because Mr. Norvell has not submitted a response to the Motion, the only admissible evidence available to the Court at summary judgment is the sworn declarations of Defendants and their exhibits. In its analysis, the Court relies on such evidence, viewed in the light most favorable to Mr. Norvell.

### i.   Excessive Force under the Eighth Amendment

Defendants argue that Mr. Norvell's right to be free from excessive force, protected by the Eighth Amendment, was not violated on March 1, 2016, because the record clearly indicates that a deputy sheriff maneuvered Mr. Norvell into the holding cell with minimal force and no malicious intent. Mot. 9–10.[1] Mr. Norvell has not responded to this argument. Viewing the evidence in the light most favorable to Mr. Norvell, the Court agrees with Defendants.

A prisoner has the right to be free from cruel and unusual punishment under the Eighth Amendment, including physical abuse by guards. Whenever prison and jail officials stand accused

---

[1] Stemming from the same March 1st allegation in the complaint, Mr. Norvell also claims Defendants unlawfully seized him in violation of the Fourth Amendment. Compl. ¶ 25; *see also* Compl. ¶ 12 ("[A Deputy] came by and grabbed Plaintiff and with great force, slammed Plaintiff into a pillar extending from the wall[.]"). However, such a claim does not lie for a convicted prisoner. *See Crozier v. Endel*, 447 F. App'x 861, 862 (9th Cir. 2011) ("[T]here is no Fourth Amendment right to be free from searches and seizures in prison [and jail]."); *see also Reid v. United States*, No. 1:14-CV-1163-LJO-MJS, 2014 WL 6669343, at *5 (E.D. Cal. Nov. 24, 2014) (dismissing prisoner-plaintiff's unlawful seizure claim brought under the Fourth Amendment because it was more properly addressed under the Eighth Amendment). As Defendants state, all of Mr. Norvell's factual allegations in the complaint regarding the claim that he was "grabbed [and] slammed into a pillar" are analyzed under Eighth Amendment. *See* Mot. 2 n.1, 8–9.

United States District Court
Northern District of California

of using excessive physical force in violation of the Eighth Amendment, the core judicial determination is whether force was applied in a good-faith effort to maintain or restore discipline or was applied maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 317 (1986)). In making this determination, a court may evaluate the need for application of force; the relationship between that need and the amount of force used; the extent of any injury inflicted; the threat reasonably perceived by the responsible officials; and any efforts made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

Because an inquiry into excessive force "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [this Circuit] ha[s] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). However, the evidence presented does not show a genuine dispute as to any material fact relating to Mr. Norvell's claim of excessive force against Defendants. Mr. Norvell alleges that on March 1, 2016, a female deputy grabbed him and slammed him into a pillar extending from the wall as he tried to get away from the scene of an altercation between another inmate and other deputies. Compl. ¶ 11–12; Norvell Dep. 52:5-53:2, 54:11-55:1. During his deposition, Mr. Norvell clarified, testifying that Deputy Montalvo "grabbed me by the back of my head after she ran down the hallway . . . and slammed it into the metal frame, the frame part of the window, and at the same time, in one motion, grabbed me and then took – and flung me into the holding tank, squeezing – squeezing this part of my neck the whole time." Norvell Dep. 53:5-11. Defendants, through video recording of the incident and declarations, argue that the evidence shows otherwise. Mot. 9. The Hub Video, indeed, shows Deputy Montalvo walking quickly towards Mr. Norvell, opening the door to the holding cell, and then letting go of her grasp on the door to physically move Mr. Norvell around the door. *See* Hub

13

Video; *see also* Duran Decl. ¶¶ 5–7. Once she grabs the door again, she maneuvers Mr. Norvell into the holding cell. *See id.* Although the video is grainy, there is no recording of Mr. Norvell being slammed into the door, especially because Mr. Norvell continues to walk into the cell after being maneuvered to the door. *See id.* After viewing the video, no reasonable jury could find that Deputy Montalvo acted in bad faith or maliciously toward Mr. Norvell while she guided him into the holding cell during a fast-moving incident involving an altercation by another inmate. *See Anderson*, 477 U.S. at 248–49. Therefore, based on this evidence, Defendants have shown that there is no genuine issue of material fact as to whether any of the Defendants applied force in a good-faith effort to maintain control or maliciously and sadistically to cause harm. *See Hudson*, 503 U.S. at 6; *see also Silverman v. Mendiburu*, No. 17-01146 BLF (PR), 2018 WL 2215844, at *4 (N.D. Cal. May 10, 2018) (finding there exists no genuine dispute of material fact as to whether any deputies applied excessive force after reviewing video footage of the hallway showing Plaintiff being "firmly" escorted into his cell by deputies), *aff'd and remanded*, 785 F. App'x 460 (9th Cir. 2019); *Gaddy v. Solis*, No. C 11-5568 PJH (PR), 2013 WL 5202590, at *1, *4 (N.D. Cal. Sept. 16, 2013) (relying entirely on Defendants' video evidence in a similar Section 1983 case brought by a state prisoner when granting summary judgment because the "videos entirely support[ed] defendants' factual assertions and contradict[ed] plaintiff's complaint and opposition to summary judgment"), *aff'd sub nom. Gaddy v. Sherman*, 588 F. App'x 564 (9th Cir. 2014).

Even though Mr. Norvell alleged otherwise during his deposition, the motion for summary judgment in regard to the excessive force claim must be granted because this Motion is unopposed, and, as stated above, Mr. Norvell did not produce evidence raising a genuine dispute of material fact. *See Celotex*, 477 U.S. at 323. Therefore, the Court grants Defendants' motion for summary judgment as to the excessive force claim.

### ii. Deliberate Indifference Resulting from the March 1, 2016 Incident under the Eighth Amendment

United States District Court
Northern District of California

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc); *see also Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (stating that to show deliberate indifference, the plaintiff must show the course of treatment the doctors chose was medically unacceptable under the circumstances *and* that the defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). In addition, mere difference of medical opinion between a physician and a prisoner—or between medical professionals—is insufficient to establish deliberate indifference. *Snow*, 681 F.3d at 987 (internal citation omitted).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle*, 429 U.S. at 104). The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)).

A prison official is subjectively deliberately indifferent if he is "aware of the facts from

15

which [an] inference could be drawn that a substantial risk of serious harm exists" and also

"draw[s] that inference." *Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1097 (9th Cir.

2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). If a prison official should have

been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no

matter how severe the risk. *Gibson*, 290 F.3d at 1188.

Defendants argue that Mr. Norvell received professionally adequate medical care while

under their custody and cite extensively to Mr. Norvell's medical records as evidence. Mot. 12–15.

Defendants maintain that no ACHS or custody staff denied Mr. Norvell medical care at any time

and that staff instead provided treatment and medications when requested by Mr. Norvell. *Id.*at 14.

Defendants also argue that any alternative treatments provided were medically acceptable and do

not establish deliberate indifference. *Id.* at 14–15. Mr. Norvell has not responded to these

arguments. The Court views the evidence in the light most favorable to Mr. Norvell. For the

reasons listed below, the Court agrees with Defendants.

Mr. Norvell alleges that after the altercation with the female deputy sheriff on March 1,

2016, he was placed in a cell and repeatedly asked for medical assistance for his injuries resulting

from the altercation but was denied such assistance. Compl. ¶ 14. About one week after March 1,

2016, Mr. Norvell alleges that he lost consciousness and fell, hitting his head.  *Id.* According to

Mr. Norvell, he remained unconscious in his cell for 45 minutes and did not regain consciousness

until he was in the hospital, and this fall and lack of immediate medical assistance resulted in "a

subdural hematoma," "brain damage," and the "exacerbation of spinal damage." *Id.* ¶¶ 14, 15, 20.

Mr. Norvell avers that Defendants were "knowing and deliberate [in their] withholding of medical

treatment." *Id.* ¶ 19.

Defendants and the record tell a different story. On March 1, 2016, ACHS nurses assessed

Mr. Norvell three times for neck, right shoulder, and right rib pain that Mr. Norvell claimed

resulted from the alleged altercation. Mot. 4; *see* Chyorny Decl. ¶ 6; March 1 Custody Nursing

Assessment. When Mr. Norvel requested head and neck x-rays around March 8, 2016, an ACHS physician examined and assessed Mr. Norvell and diagnosed cervical sprain, AC dislocation, and chest wall pain. Mot. 4; *see* Chyorny Decl. ¶ 6; White Card & Progress Notes. The doctor also ordered an extra blanket as a neck support and non-narcotic pain medications. *Id.* X-rays were ordered for Mr. Norvell's cervical spine, right rib, and bilateral shoulder on March 10, 2016, which were taken on March 11, 2016 and did not indicate any acute findings aside from chronic degenerative changes. Mot. 4; Chyorny Decl. ¶¶ 6–7; March 10 Progress Notes; X-Ray Report. Mr. Norvell asked for a neck brace from March 11 to March 17, 2016, but nurses advised him his request was pending physician review. Mot. 4; *see* Chyorny Decl. ¶¶ 7–8; March 11 White Card Notes; March 12 Custody Nursing Assessment; March 13 White Card Notes; March 14-17 Custody Nursing Assessment.

An ACHS physician ordered a cervical collar and further cervical x-rays for Mr. Norvell on March 17, 2016. Mot. 4; *see* Chyorny Decl. ¶ 9; March 17 Progress Notes; Medical Authorization Form. A different ACHS physician examined Mr. Norvell on March 22, 2016, and confirmed order of a cervical collar for Mr. Norvell. Mot. 5; Chyorny Decl. ¶ 10; March 22 Progress Notes. From March 22 to March 24, 2016, Mr. Norvell submitted medical request forms complaining about the delay in provision of a neck collar. Mot. 5; *see* Chyorny Decl. ¶ 11; March 22 White Card Notes; March 23 Custody Nursing Assessment; March 24 Custody Nursing Assessment. ACHS nurses assessed Mr. Norvell and advised him that his neck collar was on order and that he would be receiving a new muscle relaxer for pain. *Id.*

On March 25, 2016, Mr. Norvell suffered a blackout witnessed by his cellmate. Mot. 5; *see also* Chyorny Decl. ¶ 12; Emergency Resp. Report. The man down was called at 11:50 a.m. and help arrived at 11:55 a.m. Emergency Resp. Report. Mr. Norvell was taken by ambulance to SCVMC at 12:50 p.m. Mot. 5; *see also* Chyorny Decl. ¶ 12; Emergency Resp. Report. When Mr. Norvell was transferred back to the Elmwood Correctional Facility on March 29, 2016, an ACHS

17

doctor reviewed Mr. Norvell's SCVMC chart and authorized use of a cervical collar for six weeks and a walker for two weeks. Mot. 5; *see also* Chyorny Decl. ¶ 13; CSCHS Medication Verification; Pain Management Protocol. There was no mention in Mr. Norvell's SCVMC chart of a subdural hematoma or brain damage. Mot. 6; *see* Chyorny Decl. ¶ 13; SCVMC Notes. Until his release on April 16, 2016, Mr. Norvell requested pain medication changes, which were accommodated in each instance. Mot. 6; *see also* Chyorny Decl. ¶¶ 14–17; March 30-31 Custody Nursing Assessment; April 1 Progress Notes; April 4 Progress Notes; April 11 Progress Notes; April 14 Custody Nursing Assessment. Defendants assert that from March 1 to April 16, 2016— from the alleged date of the incident and the date Mr. Norvell exited the custody of the County and Department—ACHS providers consulted with Mr. Norvell no less than twenty-two times. Mot. 14; *see generally* Chyorny Decl. ¶¶ 4–17 and all attached exhibits.

There is no genuine dispute of material fact that Defendants did not act with deliberate indifference towards Mr. Norvell's care. Mr. Norvell was seen three times on March 1, 2016, the date of the incident, and was examined by a physician within a week of March 1. *See* Chyorny Decl. ¶ 6; March 1 Custody Nursing Assessment; White Card & Progress Notes. Mr. Norvell was also x-rayed about ten days after the alleged incident. Chyorny Decl. ¶ 7; X-Ray Report. A neck collar was ordered about six days after Mr. Norvell requested it. Chyorny Decl. ¶¶ 7, 9; March 11 White Card Notes; March 12 Custody Nursing Assessment; March 17 Progress Notes; Medical Authorization Form. Shortly after, Mr. Norvell underwent further x-rays imaging. Chyorny Decl. ¶ 9; XR Cervical Spine. And when Mr. Norvell complained about the delayed wait time for the collar from March 22 to 24, 2016, ACHS nurses informed him that his neck collar was on order. Chyorny Decl. ¶ 11; March 22 White Card Notes; March 23 Custody Nursing Assessment; March 24 Custody Nursing Assessment. As stated above, mere difference of medical opinion between Mr. Norvell and the ACHS physicians in how quickly the collar should have been ordered is insufficient to establish deliberate indifference. *See Snow*, 681 F.3d at 987.

The record indicates that when Mr. Norvell suffered a blackout in his cell on March 25, 2016, helped arrived within five minutes. *See* Emergency Resp. Report. Mr. Norvell was alert during this time and was taken to the hospital within an hour. *See* Emergency Resp. Report. At SCVMC, Mr. Norvell received appropriate care, both in and outside the ICU. *See* Chyorny Decl. ¶ 13; SCVMC Notes 616–619, 635–645, 681–685, 694–705. An MRI and other imaging taken at the hospital did not indicate a spinal cord injury; instead, the MRI only highlighted chronic degenerative joint disease. *See* SCVMC Notes 640–641. The record also has no mention of a subdural hematoma or brain damage. *See* Chyorny Decl. ¶ 13; SCVMC Notes.

When transferred back to the Elmwood Correctional Facility, Mr. Norvell was authorized use of a cervical collar for six weeks and a walker for two weeks. Chyorny Decl. ¶ 13; CHCHS Medication Verification; Pain Management Protocol. His requests for medication changes were approved in a timely manner until his release on April 16, 2016. Chyorny Decl. ¶¶ 14–17; March 30-31 Custody Nursing Assessment; April 1 Progress Notes; April 4 Progress Notes; April 11 Progress Notes; April 14 Custody Nursing Assessment.

Viewing the evidence in the light most favorable to Mr. Norvell, the Court finds that there exists no genuine dispute as to any material fact relating to Mr. Norvell's claim of deliberate indifference against Defendants for the reasons mentioned above. Accordingly, summary judgment is granted with respect to the Eighth Amendment deliberate indifference claim because there is simply no evidence that Defendants acted with deliberate indifference with respect to Plaintiff's serious medical needs. *See Celotex Corp.*, 477 U.S. at 323; *Snow*, 681 F.3d at 985.

### iii. Racially Offensive Verbal Harassment

Defendants argue that Mr. Norvell suffered no constitutional harm when he was allegedly verbally harassed by deputies. Mot. 15–16. Mr. Norvell has not responded to this argument. Viewing the evidence in the light most favorable to Mr. Norvell, this Court agrees with Defendants for the reasons discussed below.

19

Mr. Norvell believes that sheriff deputies "exchanged threatening, offensive, and insulting electronic communications and video recordings on their electronic devices, making threats and comments against [him], based on racial animus." Compl. ¶ 17. During his deposition, Mr. Norvell clarified this allegation, testifying about a single event of verbal harassment. *See* Norvell Dep. 96:8-102:9. He stated that on the day he was getting his x-rays completed, a group of deputies allegedly took video of him on their cell phones, and then, one of the deputies said to him, "you are lucky you aren't one of mine." *Id.* Norvell believed this event had racial connotation aimed at him because of his skin color, as all of the deputies allegedly recording him were white and Mr. Norvell is African American. *Id.*

The verbal harassment was not pled under any specific cause of action but can be assumed to be pled under the Section 1983 claim. *See* Compl. ¶¶ 17, 27, 29. Taken under Count One, verbal harassment does not rise to a constitutional deprivation or federal civil rights claim. *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (affirming district court's denial of Plaintiff's verbal harassment claim under Section 1983 at summary judgment); *see also Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (stating that "verbal harassment generally does not violate the Eighth Amendment" and "[s]ummary judgment dismissing [Plaintiff's] verbal harassment claim was proper"); *Brown v. Lithel*, 145 F. App'x 198, 200 (9th Cir. 2005) (affirming same); *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), overruled on other grounds, *Penwell v. Holtgeerts*, 386 F. App'x 665, 667 (9th Cir. 2010) (internal citation omitted) (being subjected to abusive language directed at Plaintiff's religious and ethnic background was "not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983" and therefore summary judgment was proper and affirmed). In other words, "the alleged vulgarity does not establish a genuine issue as to any material fact," *Oltarzewski*, 830 F.2d at 139 and Defendants are "entitled to judgment as a matter of law." *See City of Pomona*, 750 F.3d at 1049.

20

Because the verbal harassment claim does not rise to a constitutional violation, this claim is dismissed and summary judgment is granted as to these allegations.

### iv.   Deliberate Indifference in Regard to Training

Mr. Norvell alleges that the County and Department are directly liable to him for "their inadequacy of deputy training on the interaction with and custody of jail inmates," which amounts to deliberate indifference to the rights of Mr. Norvell under the Eighth Amendment and Section 1983. *See* Compl. ¶ 21. This failure to train includes the "failure to provide relevant training and education, to implement policies, procedures, and practices necessary to proper interaction with jail inmates, and to conduct adequate peace officer performance reviews, investigations, and corrections of previous violations." *Id.* ¶ 29. Defendants note but do not address Mr. Norvell's failure to train theory in detail. *See* Mot. 2, 8–16. Viewing the evidence in the light most favorable to Mr. Norvell, this Court finds that Defendants are entitled to summary judgment as to the failure to train theory for the reasons discussed below.

A local government body cannot be held liable under a Section 1983 "solely" because it employs a tortfeasor—"in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). However, a municipality can be held liable if "action pursuant to official municipal policy [or practice] caused a constitutional [violation.]" *Id.* In addition, a "municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal citation omitted). There must be "some underlying constitutional violation" to impose liability on a municipality under this theory. *Andrade v. City of Burlingame*, 847 F. Supp. 760, 767 (N.D. Cal. 1994) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986)).

Here, Mr. Norvell has submitted no evidence or explanation clarifying how the County and

United States District Court
Northern District of California

Department's training program is deficient. *Cf. Zuegel v. Mountain View Police Dep't*, No. 17-CV-03249-BLF, 2020 WL 5076628, at *11–*12 (N.D. Cal. Aug. 27, 2020) (finding that deposition testimony regarding officer training constituted enough evidence to establish a genuine dispute of material fact to deny a summary judgment claim based on a failure to train theory). In addition, there is no "underlying constitutional violation" from which this failure to train theory can stem, since, as discussed above,  this Court has found that there is no deliberate indifference Eighth Amendment violation resulting from the March 1, 2016 incident. *See Andrade*, 847 F. Supp. at 767; *see also Gibson*, 290 F.3d at 1193–1194. Therefore, Mr. Norvell's claim of deliberate indifference in regard to the County and Sheriff's Department's training fails and Defendants are entitled to judgment as a matter of law. *See City of Pomona*, 750 F.3d at 1049. Summary judgment is thus granted with respect to this claim.

### b.  State Law Claims

All of Mr. Norvell's remaining state claims—(2) violation of civil rights under California Civil Code § 52.1; (3) an act of violence motivated by racial bias under California Civil Code § 51.7; (4) assault; (5) negligence; and (6) intentional infliction of emotional distress—are predicated on California state law. *See* Compl. ¶¶ 31–62. Defendants maintain that Mr. Norvell's state law claims are barred by the statute of limitations and/or claim presentation requirements of the California Government Claims Act ("GCA"). Mot. 1, 16–19.

Defendants are correct. Mr. Norvell mailed a general Claim Form and a Government Tort Claim to the County of Santa Clara Board of Supervisors on March 8–9, 2016. Compl. ¶ 7; *see also* Claim Forms; Norvell Dep. 20:24-22:20. On April 1, 2016, the County mailed Mr. Norvell a notice of rejection of his claim to 1425 Bay Road, East Palo Alto, CA 94303, Mr. Norvell's listed mailing address. Mot. 6; Lobach Decl. ¶¶ 1–3; Notice of Rejection. During his deposition, Mr. Norvell was shown a copy of the County's notice of rejection dated April 1, 2016 and he recognized it. Mot. 6–7; Norvell Dep. 25:3-19. Mr. Norvell filed his complaint on December 22,

2016. *See* Compl. The GCA requires a party seeking to recover money damages from a public entity or its employees to present a written claim for damages to the entity within six months after accrual of the claim before filing suit in court. Cal. Gov't Code §§ 911.2(a), 945.4; *see, e.g.*, *Cardenas v. Cty. of Alameda*, No. C 16-05205 WHA, 2017 WL 1650563, at *5 (N.D. Cal. May 2, 2017) (GCA presentment requirement applies to state-law claims for negligence). "Only after the public entity has acted upon or is deemed to have rejected the claim may the injured person bring a lawsuit alleging a cause of action in tort against the public entity or its employees." *Daniels v. City & Cty. of San Francisco*, No. 17-CV-05914-LB, 2019 WL 3503016, at *8 (N.D. Cal. Aug. 1, 2019) (internal citation omitted). The six-month limitations period applies whether or not notice of rejection is actually received. *Dowell v. County of Contra Costa*, 173 Cal. App. 3d 896, 901 (1985).

The dates of the claim submission and denial are undisputed. Mr. Norvell filed his complaint in December 2016, more than six months after it was rejected in April 2016. *See* Compl.; Lobach Decl. ¶¶ 1–3; Notice of Rejection. Thus, Mr. Norvell's state claims are time barred and the Court grants summary judgment on Counts Two through Six. *See, e.g.*, *Daniels*, 2019 WL 3503016, at *9.

## IV.   ORDER

The Court GRANTS Defendants' motion for summary judgment as to the Section 1983 and state law claims for the reasons listed above.

Dated: November 20, 2020

BETH LABSON FREEMAN
United States District Judge